UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No.: 1:15-cv-22674-KMM

JULIEN BOURHIS, and other similarly )
situated individuals, )
 )
                 Plaintiffs, )
 )
v. )
 )
MY TRADE LLC d/b/a NOD d/b/a JAAVAN )
d/b/a M PATIO FURNITURE, MOHAMED )
HADJ-MERABET, and SEBBAH Y. HADJ- )
MERABET a/k/a Yamina Sebbah, )
 )
                 Defendants. )
 )

**PLAINTIFF JULIEN BOURHIS' RESPONSE TO DEFENDANTS' STATEMENT
OF "UNDISPUTED FACTS" IN SUPPORT OF THEIR MOTION FOR SUMMARY
JUDGMENT AND PLAINTIFF'S STATEMENT OF MATERIAL FACTS
<u>TO WHICH THERE IS A GENUINE ISSUE FOR TRIAL</u>**

Pursuant to the Federal and Local Rules of Civil Procedure, Plaintiff, JULIEN BOURHIS ("Bourhis" or "Plaintiff"), responds to Defendants', MY TRADE LLC d/b/a NOD d/b/a JAAVAN d/b/a M PATIO FURNITURE, MOHAMED HADJ-MERABET, and SEBBAH Y. HADJ-MERABET a/k/a Yamina Sebbah (collectively, "Defendants") Statement of Undisputed Facts in support of their Motion for Summary Judgment and Incorporated Memorandum of Law ("Defendants' Undisputed Facts") and files his Statement of Material Facts to which here is a genuine issue at trial. Plaintiff incorporates by reference the Declaration of Julien Bourhis, attached hereto as **Exhibit "A"**.[1]

---

[1] To ease reference, the above-listed declaration will be abbreviated by stating the witness' last name followed by the word "Dec."

1. On or about May or June of 2014, Bourhis began working for the Defendants. To get the job, he replied to a Craigslist ad that advertised a position as a web designer with experience in Search Engine Optimization ("SEO") work. (Bourhis Dec., ¶ 5).

2. In essence, the Defendants wanted someone to make their website more relevant on the Internet so that people looking for their services would find it. This is achieved by creating more "internet traffic," which eventually leads to "leads" and consequently to "sales." (Bourhis Dec., ¶ 6).

3. The Defendants are in the business of selling outdoor patio furniture, mainly wholesale. When Defendants hired Bourhis, they wanted to market their products more effectively on the Internet. (Bourhis Dec., ¶ 7).

4. MOHAMED HADJ-MERABET ("Mohamed") and SEBBAH Y. HADJ-MERABET a/k/a Yamina Sebbah ("Yamina") (collectively the "Owners") are the owners of the corporate defendant MY TRADE LLC d/b/a NOD d/b/a JAAVAN d/b/a M Patio Furniture ("Jaavan"). The Owners are employees of Jaavan and they are husband and wife. (Bourhis Dec., ¶ 8).

5. Bourhis interviewed with Mohamed to get the job at Jaavan. (Bourhis Dec., ¶ 9).

6. At all times relevant, the Owners were Bourhis' direct supervisors at Jaavan. (Bourhis Dec., ¶ 10).

7. The Owners worked primarily at Jaavan's warehouse, but visited their other stores frequently on a weekly basis. Their job at Jaavan consisted of processing sales, directing the work of employees, paying employees, and supervising the entire operations of Jaavan. (Bourhis Dec., ¶ 11).

8.      When the Defendants initially hired Bourhis, they offered him the position of web designer in charge of conducting SEO for Jaavan. At hiring, Mohamed offered Bourhis $17.50 per hour and a fixed work schedule from 9:00 a.m. to 5:00 p.m., 6 to 7 days per week, Monday through Saturday (and sometimes on Sundays). (Bourhis Dec., ¶ 12).

9.      Bourhis suggested that he could perform the work the Defendants wanted from his own home, but that proposal was immediately rejected and Mohamed directed that Bourhis work from Jaavan's warehouse located at 7227 Northwest 32 Street, Doral, Florida. (Bourhis Dec., ¶ 13).

10.     Bourhis **denies** "Defendants' Undisputed Fact" No. 3 as far as it states that Bourhis maintained other clients during the time he did work for the Defendants. The Defendants made it very clear that, while being their employee, Bourhis could not work for anyone else, and that he would have to work every day at the warehouse, under the Defendants' sole direction and control, and Bourhis complied. (Bourhis Dec., ¶ 14).

11.     Bourhis **denies** "Defendants' Undisputed Fact" No. 6. He never requested that Defendants pay him as a non-employee. In fact, it was the Defendants who insisted that Bourhis be paid like a 1099 contractor. (Bourhis Dec., ¶ 14).

12.     While working at the warehouse, Bourhis performed SEO work for the Defendants and also assisted Defendants' customers by bringing them into the showroom and showing them patio furniture that was for sale. (Bourhis Dec., ¶ 15).

13.     At the warehouse, Bourhis shared an office with the Owners. Bourhis had a desk and a computer owned by the Defendants, which he used to do SEO work for the Defendants. (Bourhis Dec., ¶ 16).

14. Bourhis **denies** "Defendants' Undisputed Fact" No. 14. Defendants employed ten to 15 people besides Bourhis and not including the Owners. These employees did everything from selling furniture, repairing umbrellas, repairing other furniture, loading and unloading furniture from the company's trucks, delivering furniture, answering phones, processing sales orders, and providing customer service. (Bourhis Dec., ¶ 17).

15. Three or four weeks after hiring Bourhis, the Defendants raised his salary to $20 per hour because the SEO work that he was doing for them resulted in an increase of Internet traffic and, as a result, an increase in sales for their business. Bourhis knows this because he was in charge of seeing the reports of how many people visited the Defendants' website, how many ordered furniture from the Defendants, and how much the Defendants' sales increased after Bourhis was hired. (Bourhis Dec., ¶ 18).

16. The Owners were very happy with Bourhis' work because it made them more money than before he started working for them. (Bourhis Dec., ¶ 19).

17. Approximately six or seven weeks into Bourhis' employment, the Defendants asked him to move to another location for Jaavan, located at 2610 South Dixie Highway, Coconut Grove, Florida (the "Store"). The Defendants informed Bourhis that at the Store he would be performing the same SEO work he was doing for them, but in addition, he would also be showing and selling furniture to Defendants' customers. (Bourhis Dec., ¶ 20). Bourhis **denies** "Defendants' Undisputed Facts" No. 4 and 10 as far as they suggest that one of Bourhis' responsibilities at the Store was to clean it himself.

18. Bourhis **denies** "Defendants' Undisputed Fact" No. 5 because its recitation of Bourhis' pay history is not entirely accurate. For selling the furniture and as an incentive, the Defendants promised to pay Bourhis 2.0% to 2.5% commission on all sales he completed for

Jaavan at the Store. The Defendants, indeed, paid Bourhis 2.0% to 2.5% of all sales he generated in addition to his $20 per hour salary, for approximately one month. After one month, the Defendants raised Bourhis' commission percentage to 3%. Later, they increased Bourhis' commission percentage to 5%, but only for sales he generated on the weekends. (Bourhis Dec., ¶ 21).

19.     The Defendants gave Bourhis the keys to the Store and changed his schedule to Mondays through Saturdays (and Sundays, unless another employee was able to cover for Bourhis) from 11:00 a.m. to 7:00 p.m. (Bourhis Dec., ¶ 22).

20.     Bourhis **denies** "Defendants' Undisputed Fact" No. 9. He most definitely was required to work a set schedule. The operating hours at the Store were from 11:00 a.m. to 7:00 p.m. However, Bourhis was required to be at the Store at 10:45 a.m. in order to open it on time. He was also required to wait 15 minutes before closing the store at 7:15 p.m. A picture of the front of the Store depicting its business hours is attached hereto as **Exhibit "B."** (Bourhis Dec., ¶ 23).

21.     Bourhis **denies** "Defendants' Undisputed Fact" No. 9. The Owners insisted that Bourhis needed to be there 15 minutes early and stay 15 minutes late because he needed to put the furniture outside the Store for showing and then put that furniture back inside the Store before closing the Store. Since Bourhis was the only person working at the Store, that had to be done in order for the Store to operate during its formal hours. (Bourhis Dec., ¶ 24).

22.     While working at the Store, Bourhis was required to clock in and out every single day. To this date, the Defendants have failed to provide copies of Bourhis' timecards, which should faithfully show all hours he worked for the Defendants. A picture of the time clock

Bourhis used to punch in and punch out while working at the Store is attached hereto as **Exhibit "C."** (Bourhis Dec., ¶ 25).

23. The Defendants provided all of the materials and equipment Bourhis used while working for the Defendants. Specifically, Bourhis used the Defendants' computers and Internet services to do his SEO work for the Defendants, he used the Defendants' credit card machine to process sales, he used the Defendants' phones to make calls on behalf of the Defendants and to receive calls from the Owners, he used the Defendants' desk and chair to work, he used the Defendants' store to work, he used the Defendants' showroom to show patio furniture to prospective customers, and he used the Defendants' furniture to sell to customers on behalf of the Defendants. (Bourhis Dec., ¶ 26).

24. Approximately three months before Bourhis was fired, the Defendants gave him Jaavan's business cards with his name. (Bourhis Dec., ¶ 27).

25. The services Bourhis rendered were an integral part of the Defendants' business. Specifically, Bourhis was the only person selling at the Store and his SEO work for the Defendants exponentially increased Internet traffic and sales of the Defendants. (Bourhis Dec., ¶ 28).

26. Bourhis was in charge of opening the Store every day for six to seven days a week. (Bourhis Dec., ¶ 29).

27. Bourhis **denies** "Defendants' Undisputed Fact" No. 9. Bourhis was directed by the Owners to stay inside the Store every day for six to seven days a week during Store hours. He was not allowed to go out of the Store at any time because no one else was at the Store to see customers if Bourhis was not there. Bourhis was forced to eat his lunches during working hours and he had to stop eating lunch if a customer walked into the Store. (Bourhis Dec., ¶ 30).

28. One day, Bourhis' friend Pierrick Michalk ("Michalk") came to the Store to bring Bourhis lunch. Michalk showed Bourhis his computer because he thought it needed repair. Bourhis checked it quickly and told Michalk that he would take care of his computer after work. To Bourhis' surprise, Yamina, one of the owners, showed up and kicked Michalk out of the store. She became very upset because she thought Bourhis was doing work for his friend during Store hours. She reminded Bourhis that he could not do any work for anyone while he was at her Store during Store hours. (Bourhis Dec., ¶ 31).

29. While at the Store, Bourhis was in charge of operating the credit card machine for Jaavan. If the credit card machine did not work for some reason, then Bourhis would call the Owners who would give Bourhis instructions on what to do, or process the sale themselves from the credit card machine at the warehouse. (Bourhis Dec., ¶ 32).

30. Bourhis was also in charge of closing the store every day he worked at the Store. (Bourhis Dec., ¶ 33).

31. The Owners constantly supervised Bourhis and closely scrutinized his work. They texted Bourhis 24/7, and called him at the Store every single day he worked, at least ten times per day. Also, the Owners frequently visited the store in person to supervise Bourhis' work. (Bourhis Dec., ¶ 34).

32. Bourhis **denies** "Defendants' Undisputed Fact" No. 8 as far as it implies that it was Bourhis' idea to submit invoices for the hours he worked to the Defendants. While Bourhis, indeed, submitted invoices to the Defendants, he did so because he was instructed by the Owners to fill out these invoices, which the Owners created so that Bourhis could bill them for the hours that he worked and the commissions that were owed to him during a pay period. Bourhis was

never allowed to ask to be paid overtime and was never paid for any overtime. (Bourhis Dec., ¶ 35).

33. Bourhis was never allowed to negotiate his pay. The salaries and raises the Defendants gave Bourhis were based on his performance as a salaried and commissioned employee of the Defendants. (Bourhis Dec., ¶ 36).

34. Bourhis **denies** "Defendants' Undisputed Fact" No. 14. The Defendants employed more than 10-15 employees when Bourhis worked for them. Just like they did with Bourhis, the Defendants labeled their other employees as "independent contractors" and paid them as 1099 workers. Also, many of the employees of the Defendants were undocumented workers, who worked "off the books," and likely the Defendants did not count them as their employees. (Bourhis Dec., ¶ 37).

35. From personal knowledge, Bourhis knows that Jaavan employed him, Yamina, Mohamed, Favian, Mark (last name unknown), three women that repaired umbrellas (names unknown), Silvia Escudero (the cleaning lady), three warehouse workers (names unknown), Cortney (a man who got injured on the job), two truck drivers (names unknown), two sales agents working from the warehouse (names unknown), and sales managers (names unknown), among others. (Bourhis Dec., ¶ 38).

36. Bourhis **denies** "Defendants' Undisputed Fact" No. 10 as far as it states that Defendants utilized a cleaning service to clean the Store on a regular basis. Ms. Escudero, an employee of the Defendants, cleaned the Store only once or twice during Bourhis' entire employment with the Defendants, and no one else besides her had cleaned the Store during Bourhis' employment there. (Bourhis Dec., ¶ 39).

37. Bourhis **denies** "Defendants' Undisputed Fact" No. 12. Bourhis has personally seen rats at the Store many times. Every time he saw rats or mice, he immediately called the Owners to get them to clean the Store. The Owners simply ignored Bourhis every time. (Bourhis Dec., ¶ 40).

38. The Store was full of cockroaches and bugs, such as mosquitoes. The Store also had rats, mice, rodent droppings, and rodent urine. (Bourhis Dec., ¶ 41).

39. Claudia Perez, another employee of the Defendants who preceded Bourhis at the Store, also complained about mosquito bites and about the rats that were at the Store. She sent a picture of a rat to Mohamed and Mohamed laughed at her, ignoring her request to do anything about it. (Bourhis Dec., ¶ 42).

40. Bourhis **denies** "Defendants' Undisputed Fact" No. 13. Bourhis never saw an exterminator at the Store. (Bourhis Dec., ¶ 43). The Report of exterminator provided by Defendants in response to their Motion for Summary Judgment is dated January 20, 2016 – long after Bourhis was fired.

41. Bourhis **denies** "Defendants' Undisputed Fact" No. 11. On July 3, 2015, the Defendants fired Bourhis. The firing occurred immediately after Bourhis' lawyers sent the Defendants a letter via fax and certified mail explaining how the Defendants were violating Bourhis' rights. (Bourhis Dec., ¶ 44).

42. When firing Bourhis, Mohamed told him that he was a coward who had "no balls" because he was using a lawyer to complain about the illegal actions of the Defendants. Mohamed warned Bourhis that his lawyers were going to "destroy" him and his lawyers for complaining. (Bourhis Dec., ¶ 45).

43. When Mohamed fired Bourhis, he directed him to close the Store at the end of his shift and to drop off the Store keys at his mailbox at home. (Bourhis Dec., ¶ 46).

44. Bourhis knows where Mohamed's and Yamina's house is located because he has been there numerous times to drop off contracts, Sunbrella fabric, furniture materials, invoices, and to pick up and drop off keys, all at the direction of the Owners. (Bourhis Dec., ¶ 47).

45. On or before July 17, 2015, Mohamed responded Bourhis' lawyer's letter via fax and regular mail and acknowledged that he received said letter. *See* **Exhibit "D"** attached hereto. (Bourhis Dec., ¶ 48).

46. When Bourhis was fired, he was not paid his last paycheck. To date, the Defendants still have not paid Bourhis his last paycheck. In fact, Defendants allegedly told Bourhis that they did not fire him and that they want him back, but they never offered to pay him his last paycheck, or to get rid of the rats, mice, mosquitoes, and roaches at their Store, or to pay for Bourhis' doctor's treatment for the physical and psychological harm caused to him by their illegal actions. (Bourhis Dec., ¶ 49).

47. Bourhis suffered great psychological harm as a result of working with rats, mice, roaches and mosquitoes, surrounded by rodent droppings and urine and general filth, dealing with constant mosquito bites, while his complaints were being ignored by his employers. (Bourhis Dec., ¶ 50).

DATED: March 14, 2016.

          Respectfully submitted,

          By: /s/ R. Martin Saenz
          R. Martin Saenz, Esq.

Fla. Bar No.: 0640166
Email: msaenz@saenzanderson.com
Ilona D. Anderson, Esq.
Fla. Bar No.: 25477
Email: iLona@saenzanderson.com
SAENZ & ANDERSON, PLLC
20900 N.E. 30th Avenue, Ste. 800
Miami, Florida 33180
Telephone: (305) 503-5131
Facsimile: (888) 270-5549

## CERTIFICATE OF SERVICE

I hereby certify that on March 14, 2016, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or *pro se* parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By  /s/ R. Martin Saenz

## SERVICE LIST

**Bourhis, Julien v. My Trade LLC, et al.**
Case No.: 1:15-cv-22674-KMM
**United States District Court, Southern District of Florida**

**Anthony M. Georges-Pierre, Esq.**
REMER & GEORGES-PIERRE, PLLC
44 West Flagler St., Ste. 2200
Miami, Florida 33130
Telephone (305) 416-5000
Facsimile (305) 416-5005
*Counsel for Defendants*